# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION
# IN ADMIRALTY

| | |
|---|---|
| Tammy McCutcheon, ) | |
| ) | C.A. NO.: 2:07-CV-4079-PMD |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **FINDINGS OF FACT AND** |
| Charleston Boatworks, Inc., ) | **CONCLUSIONS OF LAW** |
| ) | |
| Defendant. ) | |
| _____) | |

This matter was tried without a jury on November 30, 2009. Having considered the witness testimony and exhibits presented at trial and the parties' submissions, the court makes the following findings of fact and conclusions of law. For the reasons stated below, the Court awards judgment for Plaintiff.

## FINDINGS OF FACT

1. This is a maritime action brought by Plaintiff Tammy McCutcheon ("Plaintiff") for Breach of Bailment Duty arising from the partial sinking and subsequent rain water damage to the RACHEL II, a 38-foot 1969 Hatteras Motor Yacht, Hull Identification Number 38DC328, Official Number 1030035 ("the Vessel").

2. Plaintiff purchased the Vessel in 1999 for $75,000.

3. At the end of May 2007, Defendant Charleston Boatworks, Inc. ("Defendant") had its boat captain deliver the vessel from Plaintiff's slip at the Charleston Harbor Marina to its boatyard for replacement of a cleat and repair of the vessel's swim platform.

4. The Vessel was delivered to Defendant in good order and condition except for the items listed in Defendant's invoice 608 to Plaintiff.

1

5. Defendant kept the Vessel hauled out at its boatyard during these repairs, and Defendant had exclusive access to the Vessel while hauled out at its facility.

6. Following these repairs, on June 27, 2007 Defendant launched the Vessel and had a boat captain deliver the Vessel from its boatyard to Plaintiff's slip at Charleston Harbor Marina.

7. The Vessel had Rule 2000 model bilge pumps that were located in the forward and aft of the Vessel.

8. The batteries that power the bilge pumps were not charged prior to launch of the vessel on or about June 27, 2007.

9. Defendant invoiced Plaintiff $150 for the captain's service to operate the Vessel from the marina to its boatyard and another $150 for the captain's service to operate the Vessel back from its boatyard to Plaintiff's slip at the marina.

10. On June 28, 2007, the day after Defendant delivered the Vessel, Plaintiff's husband, Tom Belino, found the Vessel taking on water through its stuffing boxes.

11. Joe Beasenburg of Charleston Marine Services, Inc. pumped out the partially submerged Vessel and towed the Vessel back to Defendant's boatyard.

12. Charleston Marine Services invoiced Plaintiff $4,935.00 for pumping out and towing the Vessel after the submersion, and Plaintiff paid the full amount of that invoice.

13. Mr. Beasenburg testified that water was entering the Vessel through the stuffing boxes, that when a boat is put in after she has been "on a hill" it is common practice to readjust her stuffing boxes, and that he eventually stopped the water from coming into the Vessel by tightening the bolts on the stuffing box with a wrench.

14. Defendant's General Manager, Jay Bowen, testified that unless the yard serviced the stuffing box in its original repair, it was not general practice to check every stuffing box after the boat has been hauled and launched.

15. However, Mr. Bowen admitted that in his time at the boatyard, he had experienced situations where a boat is put up on the hill, the packing glands dry out, and when the boat is put into the water, after running it, the packing glands have to be readjusted, and that he had adjusted such packing glands in the past on numerous occasions.

16. After the Vessel was returned to Defendant's yard on June 28, 2007, Plaintiff's insurer, Boat/U.S. appointed Scot N. Honeycutt, a marine surveyor employed by Global Marine Services, to survey the damages sustained by the Vessel and to obtain repair estimates.

17. Mr. Honeycutt included in his October 15, 2007 report "that Charleston Marine Services reported that the shaft log stuffing boxes were leaking resulting in the flooding of the vessel," and he testified that he never determined any other cause of the flooding.

18. Mr. Honeycutt testified that he was aware that when a boatyard removes a vessel from the water and allows the stuffing boxes to dry out, the boatyard needs to readjust them when the vessel goes back into the water.

19. Mr. Honeycutt received an estimate from Defendant in the amount of $ 11,300.00. Mr. Honeycutt concluded that this estimate was reasonable and fully addressed the loss related damages and needed repairs. Mr. Honeycutt reported the estimate to Boat/US.

20. However, Mr. Honeycutt did not authorize Defendant to begin the repairs.

21. Defendant then proceeded with the repairs outlined in its estimate *without* Plaintiff's, or any other party's, authorization.

22. Plaintiff had paid for all the pre-sinking repairs to the Vessel; however, Plaintiff did not authorize the post-submersion work, had no idea what repairs were being completed, was shocked to get a bill from Defendant, and did not pay the bill for the post-submersion repairs.

23. Defendant only partially completed the repairs and did not replace all of the wiring that needed to be replaced and did not repair or replace the engines, transmissions, generator, plumbing, or air conditioning system.

24. Plaintiff then asked to have the Vessel moved to a different boatyard.

25. Defendant refused to release the Vessel until it was paid for the post-submersion repairs.

26. While the boat remained at Defendant's boatyard post-submersion, Defendant allowed further damage to the Vessel by leaving her windows and hatches open allowing further water damage to the Vessel. The Vessel was left open to the elements for at least a few weeks.

27. Defendant claimed storage fees in the amount of $4,540.00 for the Vessel from September 21, 2007 through October 2, 2007 despite the fact that Defendant refused to allow the Vessel to be removed from the yard at Plaintiff's request.

28. Plaintiff eventually sold the vessel for $20,000 to Jennifer Jeffries, who had no previous relationship with Plaintiff. This sale for $20,000 was an arm's length transaction.

29. "Fair Market value" has been defined as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright,* 411 U.S. 546, 551 (1973).

30. As the sale to Jennifer Jeffries was an arm's length transaction between a willing buyer and a willing seller, neither being forced to buy or sell and both having reasonable knowledge of relevant facts, the Court finds that the post-submersion fair market value of the Vessel was $20,000.

31. As to the Vessel's pre-loss fair market value in May 2007, Plaintiff claims that the Vessel was worth $90,000.

32. Plaintiff purchased the Vessel in 1999 for $75,000.

33. After purchasing the Vessel in 1999, Plaintiff upgraded and replaced many features on the Vessel including adding electronics, replacing galley appliances, refinishing woodwork and trim, upgrading all of the décor, light fixtures, and cabinet doors, installing new canvas, adding a central vacuum system, installing a new air conditioner, upgrading the navigation system, and completing many other renovations to the Vessel.

34. Plaintiff's husband, Tom Belino, estimates that Plaintiff spent between $50,000 and $75,000 upgrading the Vessel between the time Plaintiff purchased the Vessel in 1999 and the time Plaintiff put the Vessel on the market in 2000.

35. In 2000, Mr. Kuneyl, a boat broker, unsuccessfully attempted to sell the Vessel for Plaintiff for $125,000.

36. Mr. Kuneyl testified that in 2007 the market for such vessels had gotten softer than it had been in 2000, and that the Vessel's value immediately prior to the loss was $90,000. Plaintiff also testified that prior to the submersion; the Vessel was worth $90,000.

37. However, the Court agrees with Defendant in that many of Plaintiff's expenditures were for routine maintenance and for the replacement of equipment or furnishings which had either outlived their useful life or become obsolete.

38. Additionally, as Mr. Kuneyl conceded, the yacht market in 2007 was considerably softer than it had been at the time Plaintiff originally purchased the boat in 1999.

39. Finally, Defendant has introduced listings of similar vessels on the U.S. East Coast market for between $39,500 and $59,000.

40. The Court finds that the fair market value of the Vessel in 2007 before the partial submersion lies somewhere between the Plaintiff's and Defendant's estimates. Taking into consideration the original purchase price of the Vessel, the upgrades that Plaintiff made to the Vessel, normal depreciation, the considerably softer yacht market, and the comparable listings provided by Defendant, the Court finds that the Vessel was worth $60,000 before the partial submersion in June 2007.

## **CONCLUSIONS OF LAW**

1. This Court has jurisdiction over this admiralty case pursuant to 28 U.S.C. § 1333(1).

2. Contracts to repair and store vessels fall within the Court's admiralty jurisdiction, whether the vessels are kept on land or in the water. *AXA Re Prop. & Cas. Ins. Co. v. Tailwalker Marine, Inc.,* No. C.A. 2:04-1684-23, 2004 WL 3680276, at *2 (D.S.C. Dec. 17, 2004).

3. Venue is appropriate in this court, pursuant to 46 U.S.C. § 31104(a), which provides, "A civil action under this chapter [46 USCS §§ 31101 et seq.] shall be brought in the district court of the United States for the district in which the vessel or cargo is found within the United States."

4. Generally, admiralty law applies to all maritime contracts. A contract is maritime if it relates "to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." Contracts to repair or perform extensive

reconstruction of a ship fall within admiralty jurisdiction. *MP Leasing Corp. v. Colonna's Shipyard,* No. 2:07-CV-273, 2009 WL 2581575 (E.D. Va. May 8, 2009).

5. In an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty on point. *Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.,* 160 F.3d 170, 174 (4th Cir. 1998).

6. In her Complaint, Plaintiff asserts causes of action for Breach of Bailment Duty and Negligence.

7. A bailment is created by the delivery of personal property by one person to another in trust for a specific purpose, pursuant to an express or implied contract to fulfill that trust. 8A Am. Jur. 2d *Bailments* § 1 (1997).

8. Bailments are generally classified as being for (1) the sole benefit of the bailor; (2) the sole benefit of the bailee; or (3) the mutual benefit of both. Id. at § 7.

9. When a vessel is placed at a wharf or marina for storage or repairs, a bailment results for the mutual benefit of the vessel owner and the operator of the marina. *Buntin v. Fletchas,* 257 F.2d 512, 513 (5th Cir. 1958).

10. Under these circumstances, the bailee is liable for loss or damage caused by its own negligence, the failure to use ordinary care during the performance of its contractual duties. *See In re Complaint of Lady Jane, Inc.,* 818 F. Supp. 1470, 1476 (M.D. Fla. 1992).

11. In admiralty cases, the presumption of negligence is activated once the bailor establishes a *prima facie* case by showing that the vessel was delivered in good condition and was damaged while in the possession of the bailee. *Id.; see also Richmond Sand & Gravel Corp. v. Tidewater Const. Corp.,* 170 F.2d 392, 393 (4th Cir. 1948). The presumption can be rebutted in two ways: (1) by showing the use of ordinary care in the performance of the

repairs; or (2) by proving how the damage occurred and that it is not attributable to the bailee's own negligence. *Richmond Sand & Gravel,* 170 F.2d at 393-4.

12. Plaintiff's delivery of the Vessel to Defendant on or about May 30, 2007 created a bailment for mutual benefit. The agreement entered into by Plaintiff and Defendant was a repair contract, but more generally it was a contract of bailment for mutual benefit, whereby the bailor (Plaintiff) hired the bailee (Defendant) to perform repairs on the bailed property (the Vessel). *See In re Complaint of Lady Jane, Inc.,* 818 F. Supp. 1470 (M.D. Fla. 1992).

13. Plaintiff delivered the Vessel to Defendant in good order and condition except for the items listed in Defendant's invoice 608 to Plaintiff.

14. Defendant owed bailment duties to Plaintiff to ensure that the vessel's stuffing boxes were properly adjusted and that its bilge pump batteries were charged before delivering the Vessel back to Plaintiff's slip.

15. While the Vessel was in its possession, Defendant failed to properly adjust the stuffing boxes and failed to charge the bilge pump batteries before delivering the Vessel to Plaintiff's slip causing the Vessel to eventually take on water.

16. When the Vessel was returned to Defendant's possession after the partial submersion, Defendant allowed further damage to the Vessel by leaving her windows and hatches open to the elements.

17. Defendant has failed to rebut the presumption of negligence by showing the use of ordinary care in the performance of the repairs or by proving how the damage occurred and that it is not attributable to Defendant's own negligence.

18. Therefore, the Court finds that Defendant breached its duties as a bailee of Plaintiff's Vessel, and that as a direct and proximate result, Plaintiff suffered the damages discussed below.

19. In her Complaint, Plaintiff asserted a cause of action for violation of the South Carolina Unfair Trade Practices Act. However, Plaintiff presented no evidence to support a claim under SCUTPA. Therefore, the Court dismisses Plaintiff's SCUTPA claim with prejudice.

20. Defendant asserted counterclaims against Plaintiff for $3,420.00 plus interest, cost, and attorney's fees for its storage of the Vessel at its boatyard following submersion and for $11,300.50 plus interest, costs, and attorney's fees for its post-submersion repairs to the Vessel.

21. As to the costs for Defendant's post-submersion repairs to the Vessel, the Court finds that the repairs performed after the submersion were unauthorized, and that, therefore, Defendant's counter-claim for breach of maritime contract is without merit.

22. Additionally, Defendant's counter-claim for quantum meruit for the post-submersion repairs is also without merit as Plaintiff did not authorize the repairs and did not have knowledge that the repairs were being performed by Defendant. *See Mp Leasing Corp. v. Colonna's Shipyard,* 2009 WL 2581575 (E.D. Va. 2009).

23. Finally, Defendant's counter-claim for storage fees is without merit as Defendant refused to release the Vessel based on Plaintiff's refusal to pay for Defendant's post-submersion repairs, but those repairs were unauthorized.

## **DAMAGES**

1. Where, through the negligence of the bailee, bailed property is injured, damaged, partially destroyed, or impaired in value, the bailor is entitled to recover such a sum as will reasonably compensate him or her for the injury sustained. *See* 8A Am. Jur. 2d *Bailments* § 255.

2. In this case, the Court finds that Plaintiff is entitled to recover the difference in the value of the Vessel immediately before and its value immediately after it was damaged. *Id.*

3. Specifically, Plaintiff is entitled to recover the Vessels pre-loss value of $60,000 minus its post-lost value of $20,000 plus $4,935.00 for the pumping out and towing of the Vessel after the submersion, for a total of $44,935.00 in damages.

4. Pre-judgment interest is considered an element of damages in admiralty, part of full and fair compensation to the injured party. The award of pre-judgment interest in admiralty cases rests within the sound discretion of the district court. *Ameejee Valleejee and Sons v. M/V/ Victoria U.*, 661 F.2d 310, 313 (4th Cir. 1981).

5. In admiralty, pre-judgment interest is generally awarded, unless compelling reasons make such an award unjust. *LaPlante v. Sun Coast Marine Servs., Inc.*, 279 F. Supp. 2d 678, 689 (D.S.C. 2003).

6. The district courts have been urged to follow the interest rate prevailing commercially. *Id.*

7. The Court awards Plaintiff pre-judgment interest from June 28, 2007 on the basis of the weekly average one-year constant maturity Treasury yield rate in effect on June 28 of each year, compounded annually. These rates are: June 28, 2007: 4.95%; June 28, 2008: 2.33%; June 28, 2009: 0.48%.

8. Pursuant to 28 U.S.C. § 1961, the Court awards Plaintiff post-judgment interest at the legal rate from the date of this Order at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment.

## **CONCLUSION**

It is therefore **ORDERED**, for the foregoing reasons, that judgment be entered for Plaintiff Tammy McCutcheon in the sum of **$44,935.00** plus pre-judgment interest from June 28, 2007 to the date of this Order and post-judgment interest from the date of this Order. It is further **ORDERED** that Plaintiff's SCUTPA claim and Defendant's counterclaims are dismissed with prejudice. Finally, it is further **ORDERED** that the Admiralty Bond #99 BA G152 2 posted in this action by State Farm Fire and Casualty Company is hereby released.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**June 14, 2010**
**Charleston, SC**